**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA - TAMPA DIVISION**

**JEREMIAH VERNON WEBB,**

**Plaintiff,**

**v.**

**Case No. 8:25-cv-01835-JLB-CPT**

**DIOCESE OF VENICE IN FLORIDA, INC.; and**

**AMY YAGER, individually,**

**Defendants.**

---

# PROPOSED CORRECTED VERIFIED SECOND AMENDED COMPLAINT

## 42 U.S.C. § 1983 - Federal Civil Rights Action

Plaintiff Jeremiah Vernon Webb, appearing pro se and solely on his own behalf, files this proposed Corrected Verified Second Amended Complaint and alleges:

## PRELIMINARY STATEMENT - THE FOUR-STEP MECHANISM

This pleading presents the same two Defendants and same three claims as Document 26. The later sworn testimony supplies a four-step mechanism: an official DCF direction at dismissal; Yager's implementation through school control of release; a formal no-trespass process that eliminated both the carline and ICS's ordinary church alternative; and a continuing institutional course after DCF allegedly disclaimed any ongoing restriction. The details are pleaded chronologically below.

## I. COMPLIANCE WITH MAY 14, 2026 TEXT ORDER

**1.** On May 14, 2026, the Court dismissed Plaintiff's First Amended Complaint without prejudice as a shotgun pleading and granted leave to file a Second Amended Complaint that raised no additional claims.

**2.** Plaintiff timely filed the Verified Second Amended Complaint at Document 26 on May 19, 2026.

**3.** This proposed corrected pleading adds no cause of action, constitutional provision, state-law claim, or theory of recovery. It preserves the same two Defendants and the same three claims pleaded in Documents 9 and 26: procedural due process, substantive due process, and entity policy-or-custom liability under 42 U.S.C. § 1983. Facts concerning Plaintiff's Facebook or other social-media posts are pleaded only as evidence of motive, intent, the asserted decision basis, pretext, institutional approval, causation, and culpability within those existing claims. Plaintiff does not assert a First Amendment retaliation claim, an equal-protection claim, or any other additional cause of action.

**4.** The generic John Doe and Jane Doe labels used in Document 9 remain omitted. Plaintiff does not ask the Court to permit generic fictitious-party pleading. Any later request to add a specifically identified person would

require a separate motion under Rule 15 and would remain subject to every applicable defense, including service, limitations, and relation back.

**5.** After Document 26 was filed, sworn depositions and document discovery in a related state-court action supplied specific historical facts concerning the same February-through-May 2025 conduct already alleged. This pleading adds those ultimate facts to clarify who acted, what occurred, when it occurred, and the basis for each existing count.

**6.** Each count identifies the single Defendant against whom it is brought, incorporates only expressly identified factual paragraphs, and does not incorporate any preceding count.

**7.** Plaintiff references the parenting plan and timesharing schedule only to establish the parental liberty interest burdened, the existing legal baseline, Defendants' knowledge, and causation. Plaintiff does not ask this Court to determine custody, modify timesharing, enforce a parenting plan, order the return of B.A.W., or administer any domestic-relations decree.

## II. JURISDICTION AND VENUE

**8.** This action arises under the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

**9.** This Court has federal-question jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

**10.** Venue is proper under 28 U.S.C. § 1391(b) because the events occurred in Sarasota County, Florida, within the Middle District of Florida.

## III. PARTIES

**11.** Plaintiff Jeremiah Vernon Webb is a citizen and resident of Florida.

**12.** Plaintiff is the father of B.A.W., a minor child identified by initials under Federal Rule of Civil Procedure 5.2.

**13.** Plaintiff brings this action only on his own behalf. He does not represent B.A.W. and does not assert claims belonging to B.A.W.

**14.** At all material times, Plaintiff's parental rights concerning B.A.W. had not been terminated or suspended.

**15.** Defendant Diocese of Venice in Florida, Inc. ("Diocese") is a Florida not-for-profit corporation that operated, supervised, governed, or exercised authority over Incarnation Catholic School ("ICS") and its Catholic-school leadership in Sarasota County, Florida.

**16.** The Diocese prescribed standards for ICS and exercised school oversight through senior officials responsible for Catholic education, including the Superintendent of Catholic Education and other diocesan leadership.

**17.** Defendant Amy Yager was the principal of ICS during the events at issue and was responsible for student dismissal, parent access, campus restrictions,

school safety, attendance decisions, and implementation of diocesan school standards.

**18.** Yager is sued individually for her own decisions, directions, communications, approvals, and enforcement conduct.

## IV. FACTUAL ALLEGATIONS

### A. The operative parenting and pickup baseline

**19.** B.A.W. attended ICS during the 2024-2025 school year.

**20.** A 2022 Florida parenting plan provided Plaintiff equal timesharing, designated ICS as B.A.W.'s school, and used school dismissal as an exchange point on school days.

**21.** Yager received and acknowledged the operative parenting plan in May 2022. ICS also maintained student, household, emergency-contact, and pickup information identifying Plaintiff as B.A.W.'s father, and Plaintiff used Car Rider #616.

**22.** No later court order known to Plaintiff suspended his timesharing, removed him from B.A.W.'s pickup information, granted the other parent exclusive school-pickup authority, or authorized ICS or the Diocese to decide custody.

**23.** No written DCF directive, DCF safety plan, no-contact order, law-enforcement directive, or judicial order prohibited Plaintiff from receiving B.A.W. during the relevant school pickups.

**B. Yager eliminated both the ordinary and alternative pickup locations**

**24.** On February 17, 2025, Yager issued an internal school decision banning Plaintiff from campus and the carline. Yager later testified that the sheriff's office did not direct that February 17 decision.

**25.** The February 17 decision identified no court order or written DCF directive that changed Plaintiff's parental or pickup rights.

**26.** Plaintiff immediately notified ICS and Diocese leadership that the campus restriction could not be used to defeat his school pickup. To comply with the restriction, Plaintiff proposed that B.A.W. walk to the Theresa Lane gate and enter Plaintiff's vehicle, which would display Car Rider #616.

**27.** Yager testified that when ICS had excluded other parents from the carline, the ordinary alternative was for the parent to pick up the child at the church.

**28.** In Plaintiff's case, however, the restriction extended to the church and the entire church-and-school campus, eliminating the ordinary church pickup location as well as the carline.

**29.** Plaintiff asked why he was barred from both the carline and the church and repeatedly requested a workable pickup location or release procedure. Yager and ICS supplied no school-designated alternative capable of completing Plaintiff's court-ordered exchange.

**30.** Plaintiff's Theresa Lane proposal was his own effort to solve the problem. ICS did not adopt it as a reliable written release procedure. The combined

restrictions therefore did not merely regulate the manner of pickup; they eliminated every ordinary school-controlled place from which Plaintiff could receive B.A.W.

**C. Booker directed the February 18 release, and Yager implemented it**

**31.** On February 18, 2025, Florida DCF investigator David Booker arrived at ICS in his official capacity during afternoon dismissal to investigate a complaint concerning ICS and Yager. He did not arrive with a child-removal order or a court order restricting Plaintiff.

**32.** Booker interviewed B.A.W. in Yager's office. During that encounter, B.A.W. stated that she was going home with Plaintiff, and Yager knew that Plaintiff was waiting for pickup.

**33.** Booker then orally told Yager to contact the other parent and have the other parent retrieve B.A.W. Yager questioned the instruction because Plaintiff was waiting, but Booker repeated it.

**34.** Booker issued no written directive, safety plan, no-contact instruction, custody order, or timesharing suspension. His oral statement did not state that it governed future pickup dates.

**35.** Yager directed ICS administrative staff to call the other parent. Acting on Booker's official direction, ICS retained control of B.A.W. at dismissal and

released B.A.W. to the other parent instead of Plaintiff during Plaintiff's scheduled timesharing.

**36.** Yager and Booker then went to the Theresa Lane gate, where Plaintiff and responding sheriff's deputies were present, while the release decision was being implemented.

**37.** The February 18 DCF-school decision directly caused Plaintiff to lose that school exchange and his court-ordered parenting period.

**D. The formal no-trespass process expanded the exclusion**

**38.** During the same response, a sheriff's deputy suggested or asked whether ICS wanted Plaintiff formally trespassed. Yager signed a Sarasota County Sheriff's Office no-trespass form for ICS at approximately 4:35 p.m., and Deputy L. Morris was identified on the form.

**39.** Yager consulted within the Parish/Diocese school hierarchy concerning the trespass. A broader restriction was then communicated as extending beyond the school to the church campus, school events, and school Mass, with law-enforcement consequences for noncompliance.

**40.** Before Father Eric Scanlan approved and communicated the broader church-and-school-wide restriction, Yager supplied or showed him Plaintiff's Facebook and other social-media posts.

41. Scanlan testified that the social-media posts were the reason for the trespass and that, absent those posts, there would have been no trespass order.

42. The posts were described as harsh or critical of ICS and its leadership and as harmful to the school's reputation. No post identified by Defendants stated that Plaintiff intended to enter campus unlawfully or directly threatened violence against the school, staff, students, or any person.

43. A written ICS communication signed by Yager maintained the restrictions while stating that the Diocese and ICS requested that Plaintiff remove his social-media posts about the school.

44. The broadened restriction that eliminated the ordinary church pickup alternative was therefore approved on a social-media-based decision record while no written DCF directive, safety plan, judicial order, or identified direct threat authorized interference with Plaintiff's school pickup.

**E. DCF disclaimed a continuing restriction, but nonrelease continued**

45. On February 19, 2025, Yager informed Father Eric Scanlan and Father John Belmonte, the Diocese's Superintendent of Catholic Education, that it was the DCF worker's decision for the other parent to pick up B.A.W. and that Yager would not respond to Plaintiff.

**46.** Neither Yager nor the Diocese obtained any written DCF authority confirming that Booker's one-day oral statement superseded the parenting plan or applied after February 18.

**47.** Yager later communicated with a DCF supervisor or supervisory employee who told her that no safety plan existed and that B.A.W. could go with Plaintiff.

**48.** On February 27, 2025, a DCF supervisor told Plaintiff, in substance, that Booker should not have instructed withholding, that the instruction was wrong, and that DCF would direct the parties to follow the parenting plan.

**49.** On February 28, 2025, Deputy Gorsuch contacted DCF during another attempted pickup and told Yager that DCF had made no change and that B.A.W. was supposed to go home with Plaintiff.

**50.** Yager responded in substance that she understood there was no change but that B.A.W. was not going home with Plaintiff. Deputy Gorsuch then contacted DCF again and relayed the communication so that Yager could hear that the parenting plan remained controlling and that B.A.W. was supposed to leave with Plaintiff.

**51.** By February 28, Yager therefore knew that DCF had issued no continuing restriction and was directing compliance with the existing parenting plan.

**52.** B.A.W. nevertheless did not leave with Plaintiff on February 28. Yager attributed the failed release to B.A.W.'s refusal, but ICS identified no written neutral standard or review process authorizing a school-aged child to veto the court-ordered dismissal exchange.

**53.** That same day, Yager called 911 and described Plaintiff as abusive, mentally ill, and dangerous, and represented that DCF had decided B.A.W. should not go home with him.

**54.** No medical diagnosis, judicial finding, DCF safety plan, DCF finding of unfitness, law-enforcement finding of dangerousness, or direct threat of violence supported those characterizations.

**55.** Plaintiff complied with the trespass restriction, remained off campus, used the outside locations available to him, and contacted the school office. No identified police interaction involved violence by Plaintiff, and Plaintiff was not known to have violated the trespass. Compliance nevertheless could not complete the exchange because ICS had barred Plaintiff from the carline and church and supplied no functioning alternative release site.

**56.** After receiving DCF's contrary clarification, Yager continued to invoke the DCF investigation, the formal sheriff no-trespass process, alleged safety concerns, and the other parent's position to treat Plaintiff's pickup and school access as restricted.

**57.** On February 18, 19, 20, 21, and 28; March 28 and 31; April 1, 2, 3, 11, 14, 15, 16, 17, 28, 29, and 30; and May 1, 2025, Plaintiff or Plaintiff's family appeared, called, or requested release during Plaintiff's scheduled timesharing, but ICS under Yager's authority did not complete the school release to Plaintiff or Plaintiff's family.

**58.** The recurring failures were not accompanied by a written release decision, a documented neutral review, written criteria allowing a child to veto a court-ordered school dismissal, a written staff protocol, or an appeal process available to Plaintiff.

**59.** Yager gave Plaintiff no predeprivation notice of a charge or adjudicative basis, no opportunity to present the parenting plan to a neutral decisionmaker, and no prompt institutional review after each failed exchange.

### F. Diocese leadership had notice and participated in later decisions

**60.** Beginning February 17, 2025, Plaintiff repeatedly notified Diocese leadership in writing and by telephone of the campus ban, the withholding, the existing parenting plan, and the absence of judicial authority.

**61.** On February 18 and 19, Plaintiff sent detailed emails to Yager, ICS leadership, Father Scanlan, and Diocese addresses, and copied senior church

and state-oversight personnel. Plaintiff also called the Diocese on the days the school-controlled releases failed.

**62.** The written notices reached or were directed to senior Diocese leadership, including Bishop Frank J. Dewane, Chancellor Smeryk, Father Belmonte, Mary Burke, and offices responsible for Diocese and Catholic-school administration.

**63.** Yager regularly updated Father Scanlan, at least weekly and sometimes more often, regarding Plaintiff and the school restrictions. Scanlan remained in regular contact with Father Belmonte, and Chancellor Smeryk communicated on behalf of the Diocese.

**64.** Upon information and belief, senior Diocese officials responsible for Catholic-school oversight had authority to review, approve, reverse, or require correction of Yager's school-access, attendance, and withdrawal decisions.

**65.** Despite actual notice before later deprivations occurred, no Diocese official required ICS to verify Booker's exact words, obtain a written DCF directive, review the parenting plan, identify a superseding order, or provide Plaintiff a neutral institutional review.

**66.** On March 2, 2025, Yager proposed and issued a directive excluding B.A.W. from in-person attendance and routing schoolwork through the other parent.

**67.** Father Scanlan approved the March 2 proposal on Yager's first request, Father Belmonte supported it, and the decision was taken with Diocese support.

**68.** Before the March 2 decision, the approving participants did not review the parenting plan, obtain both parents' agreement, identify a court order, or obtain a DCF or law-enforcement directive authorizing the exclusion.

**69.** The March 2 directive eliminated ICS as a functioning exchange point during the exclusion period and assigned the other parent, but not Plaintiff, the role of collecting schoolwork from the school office.

**70.** On March 11, 2025, senior school, Parish, and Diocese personnel met by Zoom concerning the ongoing situation. Participants included Yager, Father Scanlan, Father Belmonte, Chancellor Smeryk, Bishop Dewane, Mary Burke, Stephanie Lieb, Joseph Devito, and William Boltrek.

**71.** No DCF or law-enforcement official participated in the March 11 meeting. After the meeting, no participant directed a review of the parenting plan, verification with DCF or law enforcement, a neutral investigation, or outreach to Plaintiff to establish a lawful release process.

**72.** B.A.W. returned to in-person attendance in late March, but school-based releases to Plaintiff continued to fail on the later dates identified above.

**73.** After an April 25, 2025 state-court order addressed a safe pickup arrangement, ICS and related entities asserted that compliance had been ensured. Their corporate testimony identified no written implementation plan, route map, staff instructions, security instructions, safety assessment, or written notice to Plaintiff describing what ICS had implemented.

**74.** On May 1, 2025, Yager proposed and signed a letter withdrawing B.A.W. from ICS effective May 2, 2025.

**75.** Father Scanlan agreed with and supported the withdrawal, Father Belmonte supported it, and Diocese leadership was consulted and supported the decision.

**76.** Before the withdrawal, the participants did not review the parenting plan's school designation, obtain both parents' agreement, identify a court order authorizing unilateral withdrawal, or obtain a DCF or law-enforcement directive.

**77.** The withdrawal eliminated the court-designated school and all remaining school-based exchange, pickup, participation, and contact opportunities involving Plaintiff.

**78.** The Diocese's notice and approval were not limited to after-the-fact inaction. Senior Diocese personnel were informed while the course of conduct was

continuing and approved, supported, or permitted the March 2 attendance exclusion and the May 1 withdrawal before those decisions became final.

**79.** The decisionmaking course reflected a policy, custom, or practice of allowing school personnel to rely on undocumented oral assertions, one parent's position, unverified safety labels, and law-enforcement exclusion without first verifying the controlling court order or providing neutral review.

**80.** No witness identified a Diocese, Parish, or ICS policy authorizing school or church personnel to override a parenting plan without a court order. The absence of written standards permitted Yager's decisions to be made and continued without consistent safeguards.

**81.** After actual notice of the initial deprivation and before later deprivations, the Diocese failed to train, direct, or supervise school leadership concerning verification of parenting orders, the limited effect of oral DCF statements, parental release disputes, neutral treatment of both parents, and prompt review after DCF disclaimed a continuing restriction.

**G. State action, causation, and injury**

**82.** Plaintiff does not allege that public funding or regulation alone converts Defendants into state actors.

**83.** The February 18 deprivation resulted from Booker's exercise of official DCF authority, Yager's willful implementation of his direction, ICS's call to the

other parent, and the coordinated release of B.A.W. to that parent while Plaintiff and responding deputies were present.

**84.** The deputy's participation in recording and delivering the formal no-trespass warning further supplied state authority that Yager used to exclude Plaintiff from the school dismissal process.

**85.** Yager thereafter invoked the DCF-originated release decision, the continuing DCF investigation, and the formal sheriff no-trespass process as authority for the continuing restrictions, even after DCF and Deputy Gorsuch told her that no DCF change existed.

**86.** The Diocese knowingly adopted or ratified that state-linked course while it remained ongoing, rather than requiring a court order, written DCF authority, or neutral review.

**87.** At minimum, the February 18 release decision and the law-enforcement-backed trespass were the product of significant state involvement and willful joint participation. The later events show continuation, intent, institutional adoption, causation, and the extent of the injury resulting from that state-linked deprivation.

**88.** Defendants' conduct directly caused the loss of Plaintiff's school pickup and timesharing on the identified dates and materially and proximately contributed to the destruction of school-based father-child access.

**89.** Plaintiff has not seen B.A.W. since February 18, 2025. Plaintiff seeks damages only to the extent Defendants' conduct is proven to have caused or proximately contributed to the missed exchanges, loss of school participation, and resulting father-child separation.

**90.** Plaintiff suffered emotional distress, mental anguish, humiliation, reputational injury, loss of school participation, loss of parental companionship, and out-of-pocket expenses associated with repeated pickup attempts and efforts to restore access.

**91.** Plaintiff also seeks nominal damages for any proven constitutional violation without compensable injury and punitive damages against Yager for intentional, reckless, or callously indifferent conduct where supported by the evidence.

## V. CLAIMS FOR RELIEF

### COUNT I
### PROCEDURAL DUE PROCESS UNDER 42 U.S.C. § 1983
### (Against Amy Yager, Individually)

**92.** Plaintiff incorporates only paragraphs 11-14, 17-18, 19-59, and 82-91. Plaintiff does not incorporate Count II or Count III.

**93.** Plaintiff possessed protected parental liberty interests in the care, custody, management, communication, and companionship of B.A.W.

**94.** Yager acted under color of state law when she willfully implemented Booker's official DCF direction, coordinated the release decision while deputies were present, obtained and used a formal sheriff no-trespass process, and continued invoking DCF and law-enforcement authority to restrict Plaintiff.

**95.** Yager deprived Plaintiff of protected parental liberty interests by causing B.A.W. to be released to the other parent during Plaintiff's scheduled timesharing, excluding Plaintiff from the school dismissal process, barring him from both the carline and the ordinary church pickup alternative, and continuing the school-controlled restrictions described above.

**96.** No objectively imminent emergency prevented predeprivation review. Yager knew the parenting plan was available, Plaintiff was waiting, and a court order or DCF verification could have been sought before the planned and repeated decisions.

**97.** The challenged course was predictable and was implemented through Yager's delegated authority over student dismissal, parent access, and alternative pickup arrangements. Yager knew ICS ordinarily used the church as an alternative when a parent could not use the carline, yet Plaintiff was barred from both locations. The deprivation was not a truly random clerical act that the institution could not anticipate or prevent.

**98.** Because the exchanges were scheduled and the restrictions recurred, simple predeprivation safeguards were practicable, including review of the parenting plan, written confirmation of any DCF authority, notice of the proposed restriction, neutral review, use of the ordinary church alternative, or designation of another written and workable release location.

**99.** Later family-court or tort remedies could not prevent the immediate and repeated loss of scheduled parenting periods and did not supply an internal process capable of stopping the recurring school-controlled deprivations before they occurred.

**100.** Yager afforded Plaintiff no constitutionally adequate notice, neutral predeprivation review, meaningful opportunity to be heard, written decision, prompt corrective process, or viable alternative pickup location.

**101.** Yager's conduct violated Plaintiff's procedural due process rights and directly and proximately caused Plaintiff's injuries and damages.

## COUNT II
## SUBSTANTIVE DUE PROCESS UNDER 42 U.S.C. § 1983
## (Against Amy Yager, Individually)

**102.** Plaintiff incorporates only paragraphs 11-14, 17-18, 19-59, and 82-91. Plaintiff does not incorporate Count I or Count III.

**103.** Plaintiff's relationship with B.A.W. is a fundamental parental liberty interest protected by the Fourteenth Amendment.

**104.** Yager acted under color of state law through the DCF- and sheriff-linked conduct alleged in the incorporated paragraphs.

**105.** Yager's conduct was intentional or recklessly indifferent: she changed the February 18 release despite knowing Plaintiff was waiting and no court order existed; treated a one-day oral DCF statement as continuing authority; persisted after DCF disclaimed any restriction; supplied Plaintiff's social-media posts for the broader trespass decision; barred Plaintiff from both the carline and ICS's ordinary church pickup alternative; used unsupported labels of dangerousness and mental illness; and repeatedly used school dismissal authority to prevent completion of Plaintiff's exchanges.

**106.** Scanlan's testimony that the Facebook and social-media posts were the reason for the trespass and that no trespass would have issued without them, the contemporaneous demand that Plaintiff remove the posts, the absence of an identified direct threat, and the elimination of every ordinary pickup alternative support a reasonable inference that the broad exclusion was intended to injure, punish, or silence Plaintiff in a manner unjustifiable by any legitimate child-safety objective.

**107.** The conduct was not a good-faith response to a documented emergency. No court, DCF safety plan, medical professional, or law-enforcement finding declared Plaintiff unfit or dangerous; no identified post contained a direct

threat of unlawful entry or violence; Plaintiff complied with the trespass; and DCF later disclaimed any continuing restriction.

**108.** The challenged course involved deliberate physical control over school dismissal, elimination of the ordinary alternative pickup location, and repeated nonrelease of a child during an existing parental access period, rather than only an informational, counseling, curricular, or administrative disagreement.

**109.** Taken together, the deliberate use of institutional and state-linked authority to displace an existing parent-child relationship without emergency, court authorization, objective criteria, or review was arbitrary and conscience-shocking in the constitutional sense.

**110.** Yager's conduct violated Plaintiff's substantive due process rights and directly and proximately caused Plaintiff's injuries and damages.

## COUNT III
## ENTITY LIABILITY BASED ON OFFICIAL DECISION, RATIFICATION, POLICY, OR CUSTOM UNDER 42 U.S.C. § 1983
**(Against Diocese of Venice in Florida, Inc.)**

**111.** Plaintiff incorporates only paragraphs 11-16, 19-30, 38-46, and 60-91. Plaintiff does not incorporate Count I or Count II.

**112.** A private entity that acts under color of state law is liable under § 1983 only for its own official decisions, ratification, policy, custom, or deliberately

indifferent training or supervision, not merely because it employed or supervised Yager.

**113.** Upon information and belief, one or more participating Diocese officials possessed final or unreviewed authority in the relevant fields, including principal supervision, parent access, attendance exclusion, school withdrawal, and correction of school decisions. Alternatively, any subordinate decision remained subject to review and was approved by an official possessing final authority.

**114.** The Diocese had actual notice before later deprivations that Yager had relied on an unwritten DCF statement and a formal sheriff no-trespass process to interfere with Plaintiff's existing parental access, that the broad restriction eliminated ICS's ordinary church pickup alternative, that social-media posts critical of ICS and its leadership were a basis for the trespass, and that DCF later disclaimed any continuing restriction.

**115.** While the course remained ongoing, senior Diocese leadership had the opportunity to review the challenged decisions and their known factual bases before later decisions became final.

**116.** Diocese leadership approved, supported, or permitted the broader church-and-school exclusion, the March 2 attendance exclusion, and the May 1 withdrawal with knowledge of the relied-on DCF statement, the formal

sheriff no-trespass process, the social-media basis supplied by Yager, the absence of written governmental authority, the existing parenting plan, the elimination of the ordinary church pickup alternative, and Plaintiff's objections.

**117.** The broader exclusion reflected a deliberate choice among available alternatives: allow the ordinary church pickup used when a parent could not use the carline, designate another neutral location, or bar Plaintiff from both the school and church and provide no workable substitute. The institutional decision selected total exclusion.

**118.** Yager transmitted the social-media material within the Parish and Diocese hierarchy; Scanlan reviewed it and testified it was the but-for reason for the trespass; and a written ICS communication attributed the demand to remove the posts to both the Diocese and ICS. Those facts support approval of both the challenged decision and its asserted basis while the course remained ongoing.

**119.** Those contemporaneous approvals constituted official decisions or ratification of both the challenged decisions and their known bases, including the social-media rationale and the decision to eliminate the ordinary church pickup alternative, rather than only an after-the-fact failure to investigate a completed incident.

**120.** Alternatively, the Diocese maintained or permitted a policy, custom, or standard operating practice allowing school personnel to restrict one parent based on undocumented oral assertions, one parent's position, criticism of the school, unverified safety labels, and law-enforcement exclusion without verifying the controlling court order, requiring written governmental authority, preserving a workable alternative pickup location, or providing neutral review.

**121.** Further in the alternative, after actual notice of the initial deprivation and before later recurring deprivations, the Diocese was deliberately indifferent to the known and obvious need to direct, train, or supervise Yager concerning court-order verification, DCF communications, parental release disputes, neutral alternative pickup arrangements, distinction between criticism and a direct threat, and prompt correction after DCF disclaimed a continuing restriction.

**122.** The Diocese's official decisions, ratification, policy, custom, and alternative deliberate indifference were moving forces behind the existing constitutional deprivations and directly and proximately caused Plaintiff's injuries and damages.

## VI. NON-DOMESTIC-RELATIONS AND NEUTRAL-PRINCIPLES LIMITATIONS

**123.** Plaintiff does not seek a custody decree, modification of timesharing, enforcement of a parenting plan, re-enrollment of B.A.W., or an order directing either parent or B.A.W. to act.

**124.** Plaintiff seeks relief for Defendants' independent conduct and injuries caused by that conduct, not review or rejection of a state-court judgment.

**125.** The requested damages can be adjudicated without modifying, supervising, or administering any state domestic-relations order.

**126.** No claim requires the Court to interpret canon law, religious doctrine, sacramental practice, clergy qualifications, or ecclesiastical governance. The challenged conduct concerns secular student dismissal, parent access, attendance exclusion, school withdrawal, and use of governmental authority and can be adjudicated under neutral principles of law.

## VII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

**A.** Enter judgment for Plaintiff on Count I;

**B.** Enter judgment for Plaintiff on Count II;

**C.** Enter judgment for Plaintiff on Count III;

**D.** Award compensatory damages against Defendants for injuries caused or proximately caused by their conduct;

**E.** Award nominal damages for any proven constitutional violation not supported by compensable injury;

**F.** Award punitive damages against Yager where legally available and supported by proof of intentional, reckless, or callously indifferent conduct;

**G.** Award taxable costs and any attorney's fees legally available under 42 U.S.C. § 1988 if Plaintiff later becomes represented by counsel; and

**H.** Grant such other relief as the Court deems just and legally available without modifying or enforcing a domestic-relations order.

## VIII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## IX. RULE 11 CERTIFICATION

Plaintiff certifies under Federal Rule of Civil Procedure 11(b) that this pleading is filed in good faith, is not filed for an improper purpose, and has evidentiary support or will likely have evidentiary support after discovery.

JEREMIAH VERNON WEBB
Plaintiff, pro se
11121 Lost Creek Terr 101
Bradenton, FL 34211
801-755-9600
jeremiah@shoponfire.com

## VERIFICATION UNDER 28 U.S.C. § 1746

I, Jeremiah Vernon Webb, declare under penalty of perjury that the factual allegations in this proposed Corrected Verified Second Amended Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on this 17 day of August, 2026, in Sarasota County, Florida.

JEREMIAH VERNON WEBB
Plaintiff, pro se

## CERTIFICATE OF SERVICE

I certify that on this 17 day of August, 2026, I filed or delivered this proposed Corrected Verified Second Amended Complaint as Exhibit A to the accompanying motion, and that no Defendant has appeared for service.

JEREMIAH VERNON WEBB