**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA - TAMPA DIVISION**

**JEREMIAH VERNON WEBB,**

**Plaintiff,**

**v.**

**DIOCESE OF VENICE IN FLORIDA, INC.; AMY**

**YAGER, individually;**

Case No. 8:25-cv-01835-JLB-CPT

**INCARNATION PARISH IN SARASOTA, INC.; and**

**REV. ERIC SCANLAN, individually, Defendants.**

---

# PROPOSED VERIFIED THIRD AMENDED COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF UNDER 42 U.S.C. § 1983 DEMAND FOR A JURY TRIAL

Plaintiff Jeremiah Vernon Webb, appearing pro se and solely on his own behalf, alleges:

## I. NATURE OF THE ACTION - FOUR LINKED DECISIONS

**1.** This case concerns a sequence of specific decisions, not an abstract disagreement over school policy or custody.

**2.** First, during school dismissal on February 18, 2025, a Florida Department of Children and Families investigator acting in his official capacity orally directed Defendant Amy Yager to release B.A.W. to the other parent rather

than to Plaintiff during Plaintiff's scheduled parenting period. Yager implemented that direction through ICS's physical control of student dismissal.

**3.** Second, no written DCF directive, safety plan, no-contact order, or court order authorized that change or suspended Plaintiff's parental rights.

**4.** Third, Yager and Defendant Rev. Eric Scanlan eliminated both the carline and the church - the alternate pickup location ICS ordinarily used for parents excluded from carline - and invoked a formal sheriff trespass process carrying a threat of arrest.

**5.** Fourth, Scanlan later testified that Plaintiff's Facebook posts criticizing ICS and its leadership were the reason for the trespass and that, without those posts, there would have been no trespass. A written ICS communication maintained the restrictions while demanding, on behalf of ICS and the Diocese, that Plaintiff remove the posts.

## II. JURISDICTION, VENUE, AND LIMITS OF THE ACTION

**6.** This action arises under the First and Fourteenth Amendments to the United States Constitution and 42 U.S.C. § 1983.

**7.** This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

**8.** Venue is proper under 28 U.S.C. § 1391(b) because the events occurred in Sarasota County, Florida, within the Middle District of Florida.

9. Plaintiff brings this action only on his own behalf. He does not represent B.A.W. and asserts no claim belonging to B.A.W.

10. Plaintiff does not sue DCF, David Booker, any law-enforcement officer, or the other parent in this action. Their conduct is alleged only where necessary to identify governmental participation, context, causation, or Defendants' knowledge.

11. Plaintiff asserts no state-law cause of action in this pleading.

12. Plaintiff does not ask this Court to determine custody, modify or enforce timesharing, direct either parent or B.A.W. to act, or administer a domestic-relations decree.

13. The parenting plan and timesharing schedule are alleged only as the existing legal baseline, the source of Plaintiff's protected parental interest, notice to Defendants, and evidence of causation and damages.

## III. PARTIES

14. Plaintiff Jeremiah Vernon Webb is a Florida citizen and the father of B.A.W., a minor child identified by initials under Federal Rule of Civil Procedure 5.2.

15. At all material times, Plaintiff's parental rights concerning B.A.W. had not been terminated or suspended.

16. Defendant Diocese of Venice in Florida, Inc. ("Diocese") is a Florida not-for-profit corporation that operated, supervised, governed, or exercised authority

over Incarnation Catholic School ("ICS") and Catholic-school leadership in Sarasota County.

**17.** The Diocese acted through senior personnel responsible for Catholic education and institutional governance, including its Bishop, Chancellor, Superintendent of Catholic Education, and other authorized officials.

**18.** Defendant Amy Yager was the principal of ICS and exercised authority over student dismissal, parent access, campus restrictions, school safety, attendance, student records, and implementation of Diocese school policy.

**19.** Yager is sued individually for her own acts, decisions, directions, communications, approvals, and enforcement conduct.

**20.** Defendant Incarnation Parish in Sarasota, Inc. ("Parish") is a Florida religious not-for-profit corporation that owned, occupied, controlled, or exercised authority over the church property and shared church-and-school campus.

**21.** Defendant Rev. Eric Scanlan was the pastor and an authorized decisionmaker for Parish property, security, trespass, church access, and coordination with ICS and Diocese leadership.

**22.** Scanlan is sued individually for his own acts, decisions, directions, communications, approvals, and enforcement conduct.

## IV. THE EXISTING PARENTAL AND SCHOOL BASELINE

**23.** B.A.W. attended ICS during the 2024-2025 school year.

**24.** A 2022 Florida parenting plan provided Plaintiff equal timesharing, designated ICS as B.A.W.'s school, and used school dismissal as an exchange point on school days.

**25.** Yager received and acknowledged the operative parenting plan in May 2022. ICS maintained pickup and student information identifying Plaintiff as B.A.W.'s father, and Plaintiff used Car Rider #616.

**26.** No later court order known to Plaintiff suspended his timesharing, removed him from the pickup information, granted the other parent exclusive school-pickup authority, or authorized Defendants to decide custody.

**27.** No written DCF directive, DCF safety plan, no-contact order, law-enforcement directive, or judicial order prohibited Plaintiff from receiving B.A.W. during the relevant school pickups.

**28.** No court, DCF safety plan, medical professional, or law-enforcement finding declared Plaintiff unfit or dangerous during the relevant period.

**29.** Defendants were therefore confronting an existing parenting and dismissal baseline, not a legal vacuum.

## V. PROTECTED SPEECH, KNOWLEDGE, AND ADMITTED MOTIVE

**30.** Before and during the challenged events, Plaintiff used Facebook and written communications to criticize ICS, Yager, Parish and Diocese leadership concerning school governance, child welfare, parental access, alleged retaliation, and institutional accountability.

**31.** Plaintiff also petitioned Yager, ICS personnel, Parish and Diocese leadership, the Florida Department of Education, DCF oversight personnel, the Governor's office, and law enforcement for investigation and redress.

**32.** The protected portions of Plaintiff's speech and petitions did not contain an identified true threat of violence or statement of intent to enter property unlawfully.

**33.** Yager knew Plaintiff's viewpoint, received or collected his posts, discussed them within the Parish and Diocese hierarchy, and supplied or showed them to Scanlan before the broader trespass decision.

**34.** Scanlan reviewed the posts and described them as harsh, aggressive, critical of ICS and its leadership, and detrimental to the school's reputation.

**35.** Scanlan testified that the posts were the reason for the trespass and that, without the posts, there would have been no trespass order.

**36.** A written ICS communication signed by Yager maintained Plaintiff's restrictions while stating that the Diocese and ICS requested that Plaintiff remove his social-media posts about the school.

## VI. STATE ACTION IS ALLEGED ACT BY ACT

**37.** State action is alleged act by act. Plaintiff does not allege that public funding, regulation, or the existence of a parenting plan alone transformed every act of Defendants into state action.

**38.** The February 17 internal school ban, standing alone, is not alleged to be state action. State action is alleged only where Defendants implemented an official DCF release direction, used a formal sheriff no-trespass process, obtained significant governmental aid, or willfully participated with public officials in the specific challenged deprivation.

### A. Official DCF direction

**39.** On February 18, 2025, Florida DCF investigator David Booker arrived at ICS in his official capacity during afternoon dismissal. He did not possess a child-removal order or court order restricting Plaintiff.

**40.** Booker interviewed B.A.W. in Yager's office. During that encounter, B.A.W. stated that she was going home with Plaintiff, and Yager knew Plaintiff was waiting for pickup.

**41.** Booker orally told Yager to contact the other parent and have that parent retrieve B.A.W. Yager questioned the instruction because Plaintiff was waiting, but Booker repeated it.

**42.** Booker issued no written directive, safety plan, no-contact instruction, custody order, or timesharing suspension. His oral statement did not identify any duration beyond that day.

## B. Yager implemented the official direction through dismissal control

**43.** Yager directed ICS staff to call the other parent. Acting on Booker's official direction, ICS retained physical control of B.A.W. at dismissal and released B.A.W. to the other parent rather than Plaintiff during Plaintiff's scheduled parenting period.

**44.** Yager and Booker then went to the Theresa Lane gate, where Plaintiff and responding sheriff's deputies were present while the release decision was being implemented.

## C. The formal sheriff no-trespass process supplied governmental consequences

**45.** During the same response, a sheriff's deputy suggested or asked whether ICS wanted Plaintiff formally trespassed. Yager signed a Sarasota County Sheriff's Office no-trespass form for ICS at approximately 4:35 p.m.

**46.** The sheriff process supplied formal governmental recording, delivery, and arrest consequences to a restriction selected and authorized by ICS personnel.

**D. Scanlan and institutional leadership expanded and continued the exclusion**

**47.** Yager consulted Scanlan and others in the Parish and Diocese hierarchy. Scanlan approved and communicated a broader restriction extending to the church, school events, school Mass, and the shared campus, with threatened law-enforcement consequences for noncompliance.

**48.** Yager testified that when ICS excluded other parents from the carline, the ordinary alternative was pickup at the church.

**49.** In Plaintiff's case, the combined carline, church, and campus restrictions eliminated both the ordinary pickup method and ICS's ordinary alternative.

**50.** Plaintiff asked for a workable location and proposed a Theresa Lane gate procedure. Defendants did not adopt a reliable written release procedure or designate another school-controlled location.

**51.** Plaintiff does not claim a freestanding constitutional right to enter private church property. He challenges the alleged state-linked, speech-motivated use of dismissal control and formal no-trespass authority to eliminate the established pickup path and expose him to arrest-backed exclusion.

## VII. THE COURSE CONTINUED AFTER DCF CLARIFICATION AND SENIOR-LEADERSHIP REVIEW

**52.** On February 19, Yager informed Scanlan and Father John Belmonte that it was the DCF worker's decision for the other parent to pick up B.A.W. and stated that she would not respond to Plaintiff.

53. Plaintiff repeatedly notified ICS, Parish, and Diocese leadership that no court order or written DCF directive authorized the withholding and that he needed a workable pickup procedure.

54. Plaintiff's written notices began no later than February 17 and continued while the restrictions and failed exchanges remained ongoing. Senior Diocese recipients included Bishop Frank Dewane, Chancellor Michael Smeryk, education officials, and other leadership.

55. DCF personnel later clarified that no safety plan existed, that DCF had not changed the parenting plan, and that B.A.W. could leave with Plaintiff.

56. On February 28, a responding deputy contacted DCF and relayed to ICS that the parenting plan remained unchanged and that B.A.W. was supposed to go with Plaintiff. The exchange still did not occur.

57. Defendants contend that B.A.W. refused. Plaintiff alleges that ICS still controlled dismissal, did not use ordinary school authority to implement a neutral release process, did not bring B.A.W. to a designated exchange point, and allowed the state-linked exclusion to continue determining the result.

58. Yager refused release to Plaintiff or Plaintiff's family on February 18, 19, 20, 21, and 28; March 28 and 31; April 1, 2, 3, 11, 14, 15, 16, 17, 28, 29, and 30; and May 1, 2025.

59. The Diocese had actual notice before many later dates and had repeated opportunities to require written authority, restore a neutral pickup path, or provide review before the next scheduled dismissal.

60. Instead, the course broadened. On or about March 2, Yager proposed excluding B.A.W. from in-person attendance; Scanlan approved the proposal; Belmonte supported it; and Diocese leadership was described as supporting the decision.

61. The attendance exclusion routed schoolwork through the other parent and removed the school as a functioning exchange point without a court order, written DCF directive, or agreement of both parents.

62. On or about March 11, senior Diocese personnel participated in a meeting concerning the dispute, including Yager, Scanlan, Belmonte, Chancellor Smeryk, Bishop Dewane, and education personnel.

63. While that institutional review was available, the Diocese did not identify a superseding order, written DCF authority, direct threat, or neutral pickup protocol.

64. On or about May 1, Yager proposed and signed B.A.W.'s withdrawal from ICS; Scanlan supported it; and Diocese leadership was consulted or supported the decision.

65. The March and May decisions were not isolated after-the-fact failures to investigate. They were new decisions made while the consequences of the February course remained ongoing and after leadership had notice of the factual basis and available alternatives.

## VIII. EACH DEFENDANT IS CHARGED ONLY WITH THE INJURY CAUSED BY THAT DEFENDANT

66. The February 18 DCF-ICS release decision directly caused Plaintiff to lose that scheduled exchange and parenting period.

67. The total carline, church, and campus exclusion directly eliminated the school-controlled pickup paths available to Plaintiff and materially contributed to the later failed school exchanges.

68. Plaintiff complied with the trespass restriction rather than risk arrest. His compliance does not eliminate the objective deterrent effect or causation of the restriction.

69. Plaintiff has not seen B.A.W. since February 18, 2025.

70. Plaintiff does not allege that Defendants alone legally caused every day of the continuing separation. He seeks only damages caused or proximately caused by each Defendant's own conduct, including the identified missed exchanges, loss of father-child access and communication, loss of school participation, emotional distress, humiliation, reputational injury, and out-of-pocket expense.

71. Nominal damages are sought for each proven constitutional violation even if compensatory damages are limited, and punitive damages are sought only against the individual Defendants where legally available.

## IX. CLAIMS FOR RELIEF - EACH COUNT NAMES ONE DEFENDANT AND ONE THEORY

### COUNT I
### FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
### (Against Amy Yager, Individually)

72. Plaintiff incorporates only paragraphs 1-15, 18-19, and 23-71. He does not incorporate any other count.

73. Plaintiff engaged in protected speech and petitioning by criticizing ICS and its leadership and requesting investigation and redress from institutional and governmental recipients.

74. Yager knew Plaintiff's speech and viewpoint, received or collected his posts, supplied or showed them to Scanlan, and signed a communication maintaining restrictions while demanding removal of the posts.

75. Yager personally imposed or maintained adverse actions, including the carline and campus ban, authorization of the formal trespass process, elimination of a workable school pickup path, and continuation of school restrictions under a credible threat of arrest.

76. Those actions would likely deter a person of ordinary firmness from continuing the protected speech and petitions.

77. Plaintiff's protected speech was a but-for cause of Yager's adverse conduct, as shown by the contemporaneous demand to remove the posts, Yager's transmission of the posts for the trespass decision, the timing, and Scanlan's testimony identifying the posts as the reason for the trespass.

78. Yager acted under color of state law for this count through the official DCF release direction she allegedly implemented, her authorization and use of the formal sheriff no-trespass process, and her willful participation in the act-specific state-linked course alleged above.

79. Yager's retaliation violated the First Amendment and caused Plaintiff's injuries and damages.

## COUNT II
## FIRST AMENDMENT RETALIATION UNDER 42 U.S.C. § 1983
## (Against Rev. Eric Scanlan, Individually)

80. Plaintiff incorporates only paragraphs 1-15 and 20-71. He does not incorporate any other count.

81. Plaintiff engaged in the protected speech and petitioning described above.

82. Scanlan knew the content and viewpoint of Plaintiff's posts because Yager supplied or showed them to him before he approved the broader restriction.

83. Scanlan personally approved and communicated exclusion from the church, school events, school Mass, and the shared campus, eliminated the ordinary

church pickup alternative, and threatened law-enforcement consequences for noncompliance.

**84.** That total exclusion and credible threat of arrest would likely deter a person of ordinary firmness from continuing protected criticism and petitions.

**85.** Plaintiff's speech was the but-for cause of Scanlan's adverse decision. Scanlan testified that the posts were the reason for the trespass and that no trespass would have existed without them.

**86.** Scanlan acted under color of state law, as pleaded in the alternative, by selecting and maintaining the scope of a formal no-trespass restriction in a joint course that depended on sheriff recording, delivery, and threatened enforcement. Plaintiff alleges sufficient joint participation or significant state aid as to that specific conduct; proof remains for discovery.

**87.** Scanlan's retaliation violated the First Amendment and caused Plaintiff's injuries and damages.

## COUNT III
## FIRST AMENDMENT ENTITY LIABILITY BASED ON OFFICIAL DECISION OR RATIFICATION UNDER 42 U.S.C. § 1983
## (Against Diocese of Venice in Florida, Inc.)

**88.** Plaintiff incorporates only paragraphs 1-71. He does not incorporate any other count.

**89.** The Diocese is not sued on respondeat superior. Plaintiff alleges its own official decisions, contemporaneous approvals, and ratification while the challenged course remained ongoing.

**90.** Senior Diocese personnel had actual notice of the protected criticism, the demand to remove the posts, the absence of a direct threat or written DCF restriction, the elimination of the church alternative, and DCF's later clarification.

**91.** A written ICS communication attributed the demand that Plaintiff remove the posts to both ICS and the Diocese while the restrictions remained in force.

**92.** Diocese leadership participated in or supported new decisions after receiving that notice, including the March attendance exclusion, the March 11 senior-leadership review, continuation of the restrictions, and the May withdrawal.

**93.** One or more senior Diocese officials possessed final or unreviewed authority over the challenged school decisions, or contemporaneously approved both the decisions and their known speech-based or unsupported basis. The precise allocation of final authority is maintained in Diocese governance records.

**94.** The Diocese acted under color of state law, as pleaded, only to the extent its authorized officials knowingly adopted or ratified the act-specific state-

linked course. Plaintiff does not rely on public funding, regulation, or mere supervision.

**95.** The Diocese's official decision or contemporaneous ratification was a moving force behind the First Amendment violation and caused Plaintiff's injuries and damages.

## COUNT IV
## FIRST AMENDMENT ENTITY LIABILITY BASED ON AN OFFICIAL DECISION UNDER 42 U.S.C. § 1983
## (Against Incarnation Parish in Sarasota, Inc.)

**96.** Plaintiff incorporates only paragraphs 1-15, 20-51, and 66-71. He does not incorporate any other count.

**97.** The Parish is not sued on respondeat superior. Scanlan exercised final or unreviewed Parish authority over the church property, shared campus, trespass scope, and police-backed enforcement decision.

**98.** Acting for the Parish, Scanlan deliberately selected a church-and-campus-wide exclusion after reviewing Plaintiff's critical posts, even though the church was ICS's ordinary alternative pickup location for a parent excluded from carline.

**99.** Scanlan testified that the posts were the reason for the trespass and that the trespass would not have existed without them.

**100.** The Parish decision imposed a total exclusion and credible threat of arrest while eliminating the ordinary alternative pickup location.

**101.** The Parish acted under color of state law, as pleaded in the alternative, through Scanlan's authorized selection and maintenance of the broader scope of the formal no-trespass restriction in the joint course alleged above, including threatened police enforcement.

**102.** The Parish's official decision was a moving force behind the First Amendment violation and caused Plaintiff's injuries and damages.

## COUNT V
## PROCEDURAL DUE PROCESS UNDER 42 U.S.C. § 1983
## (Against Amy Yager, Individually)

**103.** Plaintiff incorporates only paragraphs 1-15, 18-19, 23-29, and 37-71. He does not incorporate any other count.

**104.** Plaintiff possessed a protected parental liberty interest in the care, custody, management, communication, and companionship of B.A.W., and an existing court-ordered right to the scheduled parenting periods alleged above.

**105.** Yager acted under color of state law through the official DCF release direction she allegedly implemented, the formal sheriff no-trespass process she authorized and used, and the act-specific joint course alleged above.

**106.** Yager deprived Plaintiff of the protected interest by changing the February 18 release, eliminating every ordinary school-controlled pickup location, and repeatedly controlling or maintaining nonrelease during scheduled parenting periods.

**107.** The deprivation occurred without written governmental authority, advance notice of an operative standard, a neutral decisionmaker, a meaningful opportunity to be heard, a written decision, or review before the next scheduled dismissal.

**108.** The deprivation was foreseeable and recurring, not a random clerical event. Yager possessed delegated control over dismissal, knew the future pickup dates, and had time to verify the parenting plan and DCF authority.

**109.** Practicable safeguards existed: obtain written DCF or judicial authority; use the ordinary church location; designate another neutral site; provide notice; and secure neutral review before the next school dismissal.

**110.** A later damages action or family-court proceeding could not restore a scheduled parenting period after dismissal passed. Under these alleged circumstances, predeprivation process was feasible and constitutionally required.

**111.** Yager's conduct violated procedural due process and caused Plaintiff's injuries and damages.

## COUNT VI
## PROCEDURAL-DUE-PROCESS ENTITY LIABILITY BASED ON OFFICIAL DECISION OR RATIFICATION UNDER 42 U.S.C. § 1983
## (Against Diocese of Venice in Florida, Inc.)

**112.** Plaintiff incorporates only paragraphs 1-19, 23-29, and 37-71. He does not incorporate any other count.

113. The Diocese is not liable merely because it supervised Yager. It is liable only for its own official decisions or contemporaneous ratification that caused the deprivation.

114. Before many later dismissal dates, senior Diocese personnel had actual notice that no written DCF directive or superseding order had been identified, that DCF had clarified the parenting plan remained unchanged, and that the combined ban left no ordinary pickup path.

115. The Diocese had authority and opportunity to require written authority, restore or designate a neutral pickup location, or provide review before the next scheduled dismissal.

116. Instead, Diocese leadership participated in or supported new attendance, access, and withdrawal decisions while the deprivation remained ongoing and without implementing those safeguards.

117. One or more senior Diocese officials possessed final or unreviewed authority over the challenged school decisions, or contemporaneously approved both the decisions and their known basis. The exact allocation of authority is maintained in Diocese records.

118. The Diocese acted under color of state law, as pleaded, only through its knowing adoption or ratification of the act-specific state-linked course, not because of public funding, regulation, or respondeat superior.

**119.** The Diocese's official decision or contemporaneous ratification was a moving force behind the procedural-due-process violation and caused Plaintiff's injuries and damages.

## COUNT VII
## SUBSTANTIVE DUE PROCESS - PARENTAL LIBERTY AND FAMILY INTEGRITY UNDER 42 U.S.C. § 1983
### (Against Amy Yager, Individually)
### *(Pleaded in the alternative under Rule 8(d))*

**120.** Plaintiff incorporates only paragraphs 1-15, 18-19, and 23-71. He does not incorporate any other count.

**121.** Plaintiff's relationship with B.A.W. and liberty in her care, custody, management, communication, and companionship are fundamental interests protected by the Fourteenth Amendment.

**122.** Yager acted under color of state law through the DCF-directed release decision, the formal sheriff no-trespass process, and the act-specific state-linked course alleged above.

**123.** This count does not rest on negligence, a single school-administration error, or disagreement over educational judgment.

**124.** Yager knowingly changed the February 18 release without a court order or written DCF authority; eliminated both the ordinary and alternate pickup locations; continued the course after DCF disclaimed a restriction; transmitted the posts that Scanlan identified as the but-for reason for the

trespass; and maintained repeated nonrelease during scheduled parenting periods.

**125.** No identified emergency order, safety plan, direct threat, professional finding of unfitness, or law-enforcement danger finding justified the continuing course.

**126.** The alleged physical control over dismissal, punitive speech motive, total elimination of pickup alternatives, repetition after contrary DCF notice, and resulting prolonged father-child separation support an inference of deliberate conduct intended to injure in a manner unjustifiable by a legitimate safety objective.

**127.** Taken together and accepted as true, that conduct was arbitrary in the constitutional sense and shocks the conscience.

**128.** Yager's conduct violated substantive due process and caused Plaintiff's injuries and damages.

## X. NEUTRAL-PRINCIPLES AND NON-DOMESTIC-RELATIONS LIMITATIONS

**129.** Plaintiff seeks damages for Defendants' independent conduct, not review or rejection of a state-court judgment.

**130.** No claim requires interpretation of canon law, religious doctrine, sacramental practice, clergy qualifications, or ecclesiastical belief. The issues are secular: who controlled dismissal and property access, what governmental direction

existed, why the restrictions were imposed, what process was provided, and what injuries resulted.

**131.** Plaintiff does not claim a constitutional entitlement to use private church property apart from the alleged state-linked and retaliatory use of exclusion to eliminate the established school pickup process.

**132.** Plaintiff seeks no duplicate recovery for injury caused solely by any nonparty.

**133.** The claims are pleaded in the alternative as permitted by Rule 8(d), but Plaintiff may obtain only one recovery for the same injury.

## XI. PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that the Court:

**A.** Enter judgment for Plaintiff on each count proven;

**B.** Award compensatory damages against each responsible Defendant for injuries caused or proximately caused by that Defendant;

**C.** Award nominal damages for each proven constitutional violation not supported by compensable injury;

**D.** Award punitive damages against Yager and Scanlan where legally available and supported by proof of intentional, reckless, or callously indifferent conduct;

**E.** Award taxable costs and any attorney's fees legally available under 42 U.S.C. § 1988 if Plaintiff later becomes represented by counsel;

**F.** Award pre- and post-judgment interest where legally available; and

**G.** Grant such other relief as is just and legally available without modifying or enforcing a domestic-relations order.

## XII. JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

## XIII. RULE 11 CERTIFICATION

Plaintiff certifies under Federal Rule of Civil Procedure 11(b) that this pleading is filed in good faith, is not filed for an improper purpose, has evidentiary support or will likely have evidentiary support after discovery, and presents only existing law or nonfrivolous arguments for extending, modifying, or clarifying existing law.

Dated: August 17, 2026.

______________________________

JEREMIAH VERNON WEBB
Plaintiff, pro se
11121 Lost Creek Terr 101
Bradenton, FL 34211
801-755-9600
jeremiah@shoponfire.com

## VERIFICATION UNDER 28 U.S.C. § 1746

I, Jeremiah Vernon Webb, declare under penalty of perjury that the factual allegations in this Proposed Verified Third Amended Complaint are true and correct to the best of my knowledge, information, and belief.

Executed on this 17th day of August, 2026, in Sarasota County, Florida.

_______________________________
JEREMIAH VERNON WEBB
Plaintiff, pro se
11121 Lost Creek Terr 101
Bradenton, FL 34211
801-755-9600
jeremiah@shoponfire.com

## CERTIFICATE OF SERVICE

I certify that on this 17th day of August, 2026, I filed or delivered this Proposed Verified Third Amended Complaint as Exhibit A to Plaintiff's Motion to Revise the May 14, 2026 Text Order and for Leave to Amend, to the Clerk of Court for the United States District Court for the Middle District of Florida, Tampa Division, and that no Defendant has appeared for service in this action.

_______________________________
JEREMIAH VERNON WEBB
Plaintiff, pro se
11121 Lost Creek Terr 101
Bradenton, FL 34211
801-755-9600
jeremiah@shoponfire.com